FILED & JUDGMENT ENTERED
Steven T. Salata

August 8 2017

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

*Laura T Beyer*

Laura T. Beyer
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

In re:                          )
                                )
**TANYA L. MATTESON,**          )          Chapter 13
                                )          Case No. 17-30550
               Debtor.          )
_____ )

**ORDER SANCTIONING HAVEN LEGAL SERVICES FOR VIOLATIONS OF
11 U.S.C. § 110, ENJOINING HAVEN LEGAL SERVICES FROM VIOLATING
§ 110 IN THE FUTURE, AND HOLDING HAVEN LEGAL SERVICES IN
CONTEMPT OF THE MAY 26, 2017 ORDER TO APPEAR AND SHOW CAUSE**

**THIS MATTER** is before the court on its May 26, 2017 Order

to Appear and Show Cause ("Show Cause Order"). As will be

discussed, Haven Legal Services ("HLS") is subject to sanctions

for its actions as a bankruptcy petition preparer ("BPP") in

this case due to HLS being largely non-compliant with the

requirements imposed on petition preparers by 11 U.S.C. § 110.

For similar reasons, HLS is enjoined from committing future

violations of § 110, and HLS is also held in contempt due to its

failure to appear at the June 14, 2017 hearing on the Show Cause

Order.

## PROCEDURAL HISTORY AND FINDINGS OF FACT

1.    The pro se Debtor filed her voluntary petition under Chapter 13 of the Bankruptcy Code on April 6, 2017 without the schedules, statements, and other documents required of Chapter 13 debtors. Notably, the petition was filed without the certificate of credit counseling required pursuant to 11 U.S.C. § 109(h), and part 5 of the petition was marked to indicate that the Debtor had obtained pre-petition credit counseling but did not receive a certificate.

2.    On April 26, 2017, the Bankruptcy Administrator filed the Motion for Show Cause Order Requiring a Representative of Haven Legal Services to Appear and Show Cause Why It Should Not Be Sanctioned ("Motion"). In the Motion, the Bankruptcy Administrator indicated that Haven Legal Services ("HLS") appeared to have undertaken impermissible actions in the course of preparing the Debtor's petition despite the fact that no BPP disclosure was made on the petition. The Motion also noted that HLS appeared to operate a website with an address of www.empirelegalservices.net and that, according to the website, HLS appeared to share an address with an entity known as Empire Services located at 2910 Inland Empire Boulevard, Ontario, California 91764.[1]

---

[1] The Bankruptcy Administrator notes in the Motion that the website provided that HLS operated out of suite number 116 while Empire Services operated out of suite number 114 at the Inland Empire Boulevard address.

3.   HLS filed a Response to the Motion on May 16, 2017 that suggested HLS should not be required to appear at a hearing on the Motion because HLS was located in California and HLS had no involvement with the Debtor's bankruptcy case. The Response also included a declaration from a Ms. Rita Thomas that purported to be "under penalty of perjury." The declaration provided, in relevant part, that Thomas oversaw the "files and records concerning" the "consulting business" of HLS; HLS was located at "2910 Inland Empire Blvd. Suite 116, Ontario CA 91764"; the Debtor had only retained HLS's services for claims of "wrongful foreclosure, fraud, negligence, quiet title and unfair business practices"; Thomas did not know who prepared the Debtor's bankruptcy documents; the Debtor did not pay for "bankruptcy services"; and the Debtor was essentially blaming HLS for the deficiencies in her bankruptcy case. Thomas also maintained that the Debtor was in breach of her agreement with HLS because she had only paid $700 of the $1000 fee agreed upon for the initial payment. The court issued a notice (Doc. No. 16) on May 16, 2017 advising HLS that it appeared the Response was filed by a non-attorney on behalf of an entity and that it was unlawful in North Carolina for a non-attorney to attempt to represent an entity.

4.   The court conducted a hearing on the Motion on May 19, 2017 where the Bankruptcy Administrator and the Chapter 13

3

Trustee appeared through counsel, but HLS did not appear. Malaka Williams testified at the May 19 hearing that she served as a case administrator for the court and that she took the Debtor's petition when it was filed. Williams further testified that the Debtor maintained that "they" told her to file bankruptcy and filled out the petition for her. Williams said that the Debtor allowed her to make a copy of several documents that the Debtor had in her possession at the time of the filing of the petition, and Williams stated that the Debtor told her that the person who had instructed her to file bankruptcy had also given her the documentation.

5.    The documentation included a form titled "CONSULTING SERVICES RETAINER AGREEMENT" (the "Consulting Agreement") that listed HLS as the "Consultant" and the Debtor as a "Client." The Consulting Agreement was dated April 5, 2017, and the Consulting Agreement described numerous services that HLS had been retained to perform for the Debtor. The documentation also included a credit card authorization form with HLS, a receipt for a payment of $700, and a payment schedule that authorized HLS to draft a $1000 payment on April 5, 2017 followed by five monthly payments of $700. Notably, the last payment explicitly listed on the payment schedule was a payment for September 5, 2017, but this payment was also marked "UNTIL COMPLETE," indicating that the $700 monthly payments could extend beyond September of 2017. The

court took judicial notice of the Debtor's petition and admitted the documentation into evidence at the May 19 hearing, and, based on the representations and evidence presented at the hearing, the court subsequently entered the Show Cause Order that required HLS to appear through a representative qualified to testify and show cause why HLS should not be sanctioned for its actions in this case.

6.    The Bankruptcy Administrator and the Trustee appeared through counsel at the June 14, 2017 hearing conducted on the Show Cause Order, but HLS did not attend the hearing despite the Show Cause Order's directive for HLS to do so. The Debtor appeared in person and testified about her current circumstances, her interactions with HLS, and this bankruptcy case.

7.    At the June 14 hearing, the Debtor testified that she had been employed in the banking industry for twenty years, but she was unemployed during January and February of 2017 and was weary of the possible foreclosure of her home. The Debtor said that she received various mailings from different entities that indicated they could assist her, including a mailing from HLS that stated it could help the Debtor modify her mortgage. The Debtor explained that she initially contacted an entity other than HLS after receiving these mailings, but she did not feel comfortable with that entity. The Debtor then described a

subsequent phone call in early February 2017 where she discussed her situation with a representative from HLS. The Debtor recounted three to four more contacts from HLS after the initial conversation in early February, and the Debtor said she told HLS that she would not be able to retain its services until she secured employment. The Debtor recalled receiving another letter from HLS on or around February 14, 2017, which happened to be the day the Debtor had an interview that lead to her current employment. The Debtor stated that she started her new job two weeks after the February 14, 2017 interview, she went through training at her new job in March 2017, and HLS left her a detailed voicemail message in early April 2017 that said it knew her situation and could help her. The Debtor told the court that she responded to HLS's voicemail to say she wanted to retain HLS's services and that it was during this conversation that HLS advised her to file bankruptcy. The Debtor reported that the representative from HLS, a Ms. Ariel Smith, specifically told her that she needed to file for bankruptcy under Chapter 13 of the Bankruptcy Code because it would be the best type of case for the Debtor to keep her home. The Debtor stated that, in addition to the early April phone conversation, Smith e-mailed her a set of completed documents and instructed her to take all of these documents with her to the courthouse. The Debtor verified that she complied with HLS's instructions and filed

this bankruptcy case the morning after her early April phone conversation with Smith.

8.   The Debtor testified that Smith sent her the completed bankruptcy petition in an e-mail message that read "HERE IS YOUR BK YOU NEED TO FILE IN THE MORNING." The Debtor stated that Smith's message also included Official Form 121 ("Social Security Number Statement") and the Verification of Master Mailing List of Creditors ("Creditors Matrix Verification") with the addresses of the Debtor and Bank of America attached. In addition to the documents that were to be filed with court, the Debtor said that Smith's message included instructions for signing the petition and paying the $310 filing fee in cash as well as directions to the courthouse. The Debtor testified that Smith also e-mailed her the Consulting Agreement, the credit card authorization form, a payment schedule, and an image of a receipt for a $700 payment. The Debtor acknowledged that she signed all of these documents where appropriate, turned them over to the case administrator on duty at the time she filed the petition, and let the case administrator make a copy of the documentation that was not filed with the court.

9.   The Debtor confirmed that the completed petition Smith sent to her was marked to indicate that the Debtor did not pay or agree to pay a non-attorney to help her file this bankruptcy case. However, the Debtor testified that she had paid HLS prior

to filing this case. Specifically, the Debtor stated that $300 of the $1000 payment listed first on the payment schedule went towards the filing fee for this case and that the remaining $700 went to HLS pursuant to their agreement. The Debtor recounted making the first $700 payment with her debit card, and the Debtor explained that it was her understanding that she would continue to be billed $700 until HLS was able to arrange for a mortgage modification. In addition to the non-disclosure of the Debtor's payment to HLS, the court notes that the person who completed the documents the Debtor filed with the court did not sign or otherwise provide any disclosure that a BPP had assisted the Debtor. The Debtor testified that Official Form 119, Bankruptcy Petition Preparer's Notice, Declaration, and Signature ("BPP Notice"), was not provided with the documents Smith sent her and was not filed with the petition. The Debtor recalled that the case administrator on duty at the time she filed the petition instructed her to get HLS to fill out the BPP Notice and for her to file the notice with the court. The Debtor advised the court that she sent the BPP Notice to HLS, but HLS did not return the form to her.

10. The Debtor testified that the petition Smith sent to her stated that the Debtor had received credit counseling 180 days prior to filing, but the Debtor said she had not received credit counseling. Instead, the Debtor stated that HLS informed

her that she would need to take an online course after she filed her petition. The Debtor further testified that no one from HLS told her about completing schedules; filing a Chapter 13 plan; the consequences of filing bankruptcy (other than to say it would affect the Debtor's credit score); attending the § 341 meeting of creditors; the timeframe for filing a bankruptcy petition so that the automatic stay would apply to a foreclosure sale conducted pursuant to North Carolina law; or spoke to the Debtor about any of her assets or obligations other than those related to her mortgage.

11.   The Debtor said that she received at least eight mailings from HLS, noting that HLS's mailings were sent on conspicuous pink paper. The Debtor also reported that HLS had recently been leaving her a voicemail message approximately once a week. The Debtor stated that, while she mainly recalled speaking with Smith, she had received many phone calls from various people associated with HLS.

12.   The Debtor opined that, while she did not feel the people she spoke with from HLS were attorneys, she was under the impression that HLS was providing legal services and that the people she spoke with were working with attorneys. In fact, the Debtor asserted that, on the afternoon of the petition date, she received a call from a person named "Jasmine" with HLS that informed the Debtor that all further communication was to go

through Jasmine or "Jenny" in the legal department. The Debtor
further testified that the Consulting Agreement stated that HLS
"is a legal consulting firm and its agents and representatives
cannot provide legal advice" while also stating that "[a]lthough
all files are processed by non-attorneys, each paralegal is
under direct supervision of our various attorneys." The court
observes that the Consulting Agreement goes on to acknowledge
that HLS's relationship with the Debtor "is one of high trust
and confidence and that in the course of its service to the
[Debtor,] [HLS] will have access and contact with the
proprietary and confidential information of the [Debtor]." The
Consulting Agreement says that HLS shall promptly inform the
Debtor "if any conflict of interest exists or arises at any
point during the retention and representation of the [Debtor]."
The Consulting Agreement describes a $1000 non-refundable
"Retainer fee" that was to be considered earned upon receipt and
not deposited in a trust account. In addition to the $1000
retainer fee, the Consulting Agreement says the Debtor agreed to
pay "$700/month to maintain and prosecute" the Debtor's file.

13. As also noted by the Debtor in her testimony, the
Consulting Agreement provides that HLS "agrees to perform such
consulting, advisory and related services . . . as may be
reasonably requested from time to time . . ., including but not
limited to, the services specified in the Appendix 'A' to the

Agreement." Appendix A of the Consulting Agreement provides that HLS was being hired as a "legal document preparation service." At the same time, Appendix A of the Consulting Agreement states that HLS will provide "general published factual legal information that has been written or approved by an attorney"; that HLS will help "the client represent him/herself"; and that HLS will file and serve "legal forms and documents as needed to help ensure more time." Appendix A of the Consulting Agreement then appears to list numerous services that HLS would perform on behalf of the Debtor. These services include: preparing a request for quiet title; a request for cancellation of certain recorded instruments; a request for declaratory relief; a request for an injunction; a summons; a temporary restraining order; an order in regard to a preliminary injunction; and a civil lawsuit with claims for "Breach of Contract, Slander of Title, Wrongful Foreclosure, Securitization, Unlawful Business Practices, Fraud, Unjust Enrichment, Conveyance, with Request for Rescission of Trustee's Deed (Upon Trustee's Non-Judicial Foreclosure Sale)." At the end of this list of services in Appendix A of the Consulting Agreement, there is an assertion from HLS that, if there appears to be no possibility of a "workout option" after several months, "the file will be referred to an 'In House' attorney to discuss the possibilities of civil litigation, bankruptcy, and/or a short sale."

14. The Debtor contended that the assertion in the Response that HLS did not provide the Debtor with any bankruptcy services was not true.

15. The Debtor testified that she left work from Tega Cay, South Carolina around 1:10 p.m. so she could appear on time for the hearing on the Show Cause Order that started at 2:00 p.m. on June 14, 2017 and lasted for approximately one hour. The Debtor stated that she had incurred expenses of $6.50 for parking in addition to expenses for traveling to the courthouse and that she earned around $19 per hour at her current employment. Assuming it took an hour for the Debtor to return to work after the June 14, 2017 hearing, it appears the Debtor missed approximately three hours of work as a result of her attending the hearing on the Show Cause Order.

16. At the hearing on this matter, the Debtor willingly gave forthright testimony that was backed by documentation she voluntarily turned over to Williams when the Debtor filed this case on April 6, 2017. The Debtor's testimony also is corroborated by Williams's testimony at the May 19, 2017 hearing on the Motion. As such, the court has no reason to doubt the veracity of the Debtor's testimony at the June 14, 2017 hearing.

17. At the conclusion of the June 14, 2017 hearing, the court found HLS to be in contempt of the Show Cause Order and that its conduct was punishable under § 110.

18.   After the June 14 hearing, the court received the Responsive Declaration for Haven Legal Services in Lieu of Personal Appearance and/or a Request for Permission to Appear Telephonically to Order for Appearance and to Show Cause Order Why it Should Not Be Sanctioned ("Second Response") on June 16, 2017. Similar to the Response, the Second Response includes assertions from Rita Thomas that HLS was not retained and has not advised the Debtor in regard to any bankruptcy matters and a request that HLS be excused from having a representative appear in person at the June 14 hearing on the Show Cause Order due to logistical concerns associated with the distance between its office and this court. As was the case with the Response, the court issued a notice (Doc. No. 32) on June 16, 2017 advising HLS it was unlawful for a non-attorney to attempt to represent an entity in North Carolina.

## CONCLUSIONS OF LAW

### A. Bankruptcy Code's Regulation of Bankruptcy Petitioner Preparers

19.   The Bankruptcy Code allows non-attorneys to assist debtors with preparing documents for filing as a BPP, but only "in very limited ways." In re Bodrick, Nos. 14-31516, 14-31542, 2016 WL 1555593, *4, *6 (Bankr. W.D.N.C. Apr. 14, 2016) (citations omitted). Section 110(a)(1) of the Bankruptcy Code defines a BPP as "a person, other than an attorney for the debtor or an employee of such attorney under the direct

supervision of such attorney, who prepares for compensation a document for filing." A "document for filing" is defined as "a petition or any other document prepared for filing by a debtor in a United States bankruptcy court or a United States district court in connection with a case under this title," § 110(a)(2). The Bankruptcy Code "significantly regulates the acts of BPPs and provides severe penalties for violations." Bodrick, 2016 WL 1555593, at *4.

20. Section 110 imposes strict disclosure requirements on BPPs that relate to a BPP's identity and the limited services that a BPP may provide. A BPP must sign and provide his printed name and address with every document for filing along with an identifying number [2] below the BPP's signature. § 110(b)(1), (c)(1). A BPP will be subject to fines for each document the BPP prepares for filing without the adequate disclosures. U.S. Trustee v. Womack (In re Paskel), 201 B.R. 511, 516 (Bankr. E.D. Ark. 1996). In addition, a BPP must provide a BPP Notice to the debtor "[b]efore preparing any document for filing or accepting any fees from or on behalf of a debtor." § 110(b)(2)(A). The BPP Notice must "inform the debtor in simple language that a [BPP] is not an attorney and may not practice law," and the BPP Notice may contain a non-exhaustive list of examples of legal advice

---

[2] The identifying number is either "the Social Security account number of each individual who prepared the document or assisted in its preparation," or, if the BPP is not an individual, "the Social Security account number of the officer, principal, responsible person, or partner of the [BPP]." § 110(c)(2).

that a BPP is not authorized to give. § 110(b)(2)(B)(i)—(ii). The BPP Notice must "be signed by the debtor and, under penalty of perjury, by the [BPP]" and "be filed with any document for filing." § 110(b)(2)(B)(iii).

21. Section 110 also places strict limitations on the fees that may be collected and charged by a BPP in addition to the disclosure requirements. A BPP may not "collect or receive any payment from the debtor or on behalf of the debtor for the court fees in connection with filing the petition." § 110(g). Pursuant to § 110(h), the fee charged by a BPP may not exceed the value of the services rendered, Bodrick, 2016 WL 1555593, at *4 (citing § 110(h)), and the fee charged by a BPP may not be excessive, see id. at *5 (ruling that fees of $584 and $400 were excessive); In re Evans, 413 B.R. 315, 329 (Bankr. E.D. Va. 2009) (reducing a BPP's fee from $700 to $160); In re Moore (Moore I), 283 B.R. 852, 859 (Bankr. E.D.N.C. 2002) (reducing fee from $199 to $80); In re Doser, 281 B.R. 292, 314, 318 (Bankr. D. Idaho 2002) (reducing $199 fee to $90); In re Bush, 275 B.R. 69, 71, 86 (Bankr. D. Idaho 2002) (concluding that a BPP's fee of $150 was unreasonable). The BPP must also file with the petition a declaration made under penalty of perjury that discloses "any fee received from or on behalf of the debtor within 12 months immediately prior to the filing of the case" as well as "any unpaid fee charged to the debtor." § 110(h)(2).

22.   Perhaps the most salient aspect of § 110 is its numerous prohibitions against BPP's giving legal advice or practicing law.  As this court has previously ruled, "a BPP who observes the requirements of § 110 is a typist; he is not an attorney, and he is not even a paralegal." Bodrick, 2016 WL 1555593, at *4 (citations omitted). A BPP may not "use the word 'legal' or any similar term in any advertisements, or advertise under any category that includes the word 'legal' or any similar term." § 110(f). Section 110 provides that its provisions for BPPs should not be construed in a way to facilitate or permit the unauthorized practice of law. § 110(k). Indeed, § 110(e)(2) explicitly forbids BPPs from providing "any legal advice," and § 110(e)(2) goes on to provide a non-exhaustive list of what qualifies as "legal advice." This non-exhaustive list under § 110(e)(2) includes advising the debtor: whether to file a bankruptcy petition; what chapter of Title 11 would be appropriate to file under; whether the debtor will be able to keep his or her home or other property after filing a bankruptcy petition; or what bankruptcy procedures and rights are applicable to the debtor.

23.   The failure to comply with § 110 has the potential to be expensive for a non-compliant BPP. For starters, a BPP that fails to comply with subjections (b), (c), (d), (e), (f), or (g) of § 110 may be required to forfeit all fees charged for the

case in question. § 110(h)(3)(B). "If a BPP violates § 110 or commits any fraudulent, unfair, or deceptive act, the court can require the BPP to pay the debtor's actual damages, the greater of $2000 or double the fee charged by the BPP, and attorney's fees and costs to the debtor." <u>Bodrick</u>, 2016 WL 1555593, at *4 (citing § 110(i)). "A BPP who violates § 110(b), (c), (d), (e), (f), (g), or (h) may be fined $500 for each violation, and the court must triple the total fine in certain circumstances, including where a BPP fails to disclose her identity." <u>Id.</u> (citing § 110(l); <u>U.S. Trustee v. Brown (In re Martin)</u>, 424 B.R. 496, 509 (Bankr. D.N.M. 2010)).

24.   The repercussions for non-compliant BPPs are not just limited to financial penalties. "BPPs who violate the Bankruptcy Code and/or orders of a bankruptcy court can be referred to the United States Attorney and/or the United States District Court for criminal proceedings." <u>Id.</u> (citing <u>In re Seehusen</u>, 273 B.R. 636, 646—47 (Bankr. D. Colo. 2001)).

**B. Unauthorized Practice of Law**

25.   "In addition to the authority under § 110(e)(2)(A), the court has the inherent right to regulate the practice of law before it," <u>id.</u> at *5 (citing <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 43 (1991)), and "courts generally look to state law to determine what constitutes the unauthorized practice of law," <u>id.</u> (citing <u>In re Bachmann</u>, 113 B.R. 769, 772 (Bankr. S.D. Fla.

1990)). The State of North Carolina "forbids the practice of law, the preparation of legal documents, and the dissemination of legal advice by any person who is not an active member of the Bar of the State of North Carolina." Id. (citing N.C. GEN. STAT. § 84-4). Notably, the phrase " 'practice law' " is defined in N.C. GEN. STAT. § 84-2.1 to include "the preparation and filing of petitions for use in any court" or giving any advice or opinion "upon the legal rights of any person, firm or corporation." In light of the breadth of the term "practice law" under N.C. GEN. STAT. § 84-2.1, it appears that a BPP who "exceeds the authority of § 110" will most likely be engaged in the unauthorized practice of law. Bodrick, 2016 WL 1555593, at *5 (noting that "preparing a bankruptcy petition would constitute the unauthorized practice of law in North Carolina" if it were not for "the extremely limited authority granted to BPPs by § 110"). Although not expressly defined by a statute, the State of California also appears to have a broad interpretation of what constitutes practicing law, as California common law provides that "practice law" includes "the doing and performing [of] services in a court of justice in any matter depending therein throughout its various stages and in conformity with the adopted rules of procedure." Birbrower, Montalbano, Condon & Frank v. Superior Court, 17 Cal. 4th 119, 128, 949 P.2d 1, 5 (1998) (quoting People ex rel. Lawyers' Inst. of San Diego v.

Merchants' Protective Corp., 189 Cal. 531, 535, 509 P. 363
(1922)). Preparing a legal instrument or contract qualifies as
legal advice in California, id. (citing Merchants' Protective
Corp., 189 Cal. 531, 535, 509, P. 363), so it appears that a BPP
who acts outside the confines of § 110 will likely be engaged in
the unauthorized practice of law in California just as the BPP
would in North Carolina.

**C. Injunction under § 110**

26. Pursuant to § 110(j), the court may issue an
injunction against a BPP, and a BPP may be held in contempt if
the BPP fails to adhere to the injunction. Section 110(j)(2)(A)
lays out specific criteria that will support an injunction
against a BPP, providing that the court may enjoin a BPP if the
court finds that the BPP violated § 110 or any other provision
of Title 11 and that "injunctive relief is appropriate to
prevent the recurrence of such conduct." A BPP who misrepresents
his or her experience as a BPP or engages in "any other
fraudulent, unfair, or deceptive conduct" may also be enjoined
from conduct that violates § 110. § 110(j)(2)(A)(i)(II)—(III).
Furthermore, § 110(j)(2)(B) provides that a BPP may be enjoined
from acting as a bankruptcy petition preparer altogether if the
BPP has "continually engaged" in conduct that is in violation of
§ 110(j)(2)(A)(i) and if "an injunction prohibiting such conduct
would not be sufficient to prevent such person's interference

with the proper administration of [Title 11]." It is also within the court's discretion to issue an injunction that is nationwide. <u>Bodrick</u>, 2016 WL 1555593, at *6 (citing § 110(j)(2)(B) & (3); <u>Wieland v. Assaf (In re Briones-Coroy)</u>, 481 B.R. 685, 742 & n.332 (Bankr. D. Colo. 2012)).

### SANCTIONS, INJUNCTION, & CONTEMPT

27. The e-mails from Smith and the Debtor's testimony establish that HLS prepared the petition, Social Security Number Statement, and Creditors Matrix Verification for the Debtor. Yet, § 110 does not apply to a person directly supervised by an attorney, and the Consulting Agreement and the attached Appendix A indicated that all work done by HLS would by prepared by a paralegal under the supervision of an attorney. The Debtor also said she was under the impression that the people she spoke with from HLS worked with attorneys in some form or fashion. With these indications in mind, HLS would perhaps argue that it is not subject to § 110 because attorneys supervised HLS's work. However, there is no indication that an attorney was actually involved with the Debtor's case, and, even if an attorney was involved, a non-attorney may still be subject to § 110 as a BPP notwithstanding the nominal presence of a lawyer, <u>see</u> <u>In re Johnson</u>, No. 16-30809, 2016 WL 5417367, at *5—6 (Bankr. W.D.N.C. Sept. 28, 2016) (sanctioning a BPP even though an attorney signed the debtor's petition as a bankruptcy petition preparer).

Based on the totality of the record, the contract language implemented by HLS is just a way to feign the appearance of an attorney's supervision, which appears to have misled the Debtor. Importantly, the Debtor testified that none of the people she spoke with were attorneys, no attorney has appeared in this case on HLS's behalf despite the allegations contained in the Motion and Show Cause Order, and the court had to issue notices that the Response and Second Response were filed by a non-attorney in violation of North Carolina's prohibition against the unauthorized practice of law. As such, HLS is a non-attorney "bankruptcy petition preparer" whose conduct is subject to § 110. As will be discussed, the record is replete with HLS's violations of § 110 and other applicable law, and the court will sanction HLS to the fullest extent permissible under § 110.

28. There are multiple instances in the record where it appears HLS has attempted to practice law without a license in violation of § 110(e)(2). The Debtor testified that HLS asserted it would represent her in attempting to obtain a mortgage modification and that this representation morphed into HLS advising the Debtor to file bankruptcy, specifically under Chapter 13, because it would allow the Debtor to keep her home. Moreover, the Consulting Agreement describes a relationship that mimics the relationship of an attorney and client as the Consulting Agreement provides that the relationship between the

Debtor and HLS is one of "high trust and confidence" and that HLS will promptly inform the Debtor if a conflict of interest arises. Similarly, Appendix A to the Consulting Agreement lists numerous legal services that HLS would provide such as preparing various claims for relief for the Debtor. While Thomas asserts in the Response and Second Response that HLS never provided any bankruptcy services to the Debtor, Thomas goes on to argue that HLS was retained to prosecute various claims for the Debtor and that the Debtor had not paid the full amount for these services. Assuming, arguendo, that Thomas's assertions regarding HLS's non-involvement with this case are true, the services described by Thomas still amount to the unauthorized practice of law pursuant to both North Carolina and California law.

29. The result of HLS's attempt at practicing law speaks to the reasoning behind the prohibitions of such conduct in § 110 and under state law. Along with preparing a "bare bones" voluntary petition for the Debtor, HLS incorrectly advised the Debtor that she could take a credit counseling course after filing this case without leave of court. As a result of this ill-conceived advice, the Debtor is not eligible to be a debtor under Title 11 pursuant to § 109(h), and the Debtor's attempt to keep her home is defeated for purposes of this case by her relying on what HLS told her in regard to the credit counseling requirement. Equally troubling in addition to what HLS told the

Debtor is what HLS did not tell the Debtor, as HLS never informed her of the need to attend the § 341 meeting of creditors, the need to file a Chapter 13 plan, or the timeframe for filing a bankruptcy petition to stay a foreclosure proceeding subject to North Carolina law.

30. HLS's operation undoubtedly has a nationwide reach. While HLS appears to be located in California, it directly solicited business from the Debtor who lives across the country in North Carolina, and HLS's web presence gives it the ability to reach any individual with access to the internet. In addition to its geographic scope, HLS is operating a relatively persistent and sophisticated enterprise as demonstrated by the fact that the Debtor interacted with multiple individuals claiming to work for HLS, she received at least eight mailings from HLS, and she received consistent phone calls from HLS over a period spanning from late January or early February of 2017 to at least June of 2017. Indeed, HLS wants to create a relationship of reliance with the Debtor as it advised her in early April 2017 that it was in a position to help her because it was aware of her situation. It is also worth mentioning that the Debtor is not unfamiliar with financial concepts in light of her twenty years experience in the banking industry and that the Debtor retained HLS's services because she felt the most comfortable with HLS after reaching out to another entity

23

offering similar services. Given HLS's demonstrated ability to persuade the Debtor who exercised a reasonable amount of informed discernment, there appears to be great potential for HLS to adversely affect many other individuals with its faulty approach to practicing law in light of HLS's cross-country activities.

31.  HLS appears to value its services as being commensurate with a licensed attorney, despite their deficiencies, because the payment schedule HLS sent the Debtor lists total fees of at least $4500—the typical fee charged by an attorney in this district to represent a debtor in a Chapter 13 case, see Administrative Order Amending Local Rule 2016-2(c)(1)(A) to Increase the Presumptive Base Fee for Chapter 13 Cases (Bankr. W.D.N.C. July 27, 2016), *available at* http://www.ncwb.uscourts.gov/administrative-orders. While the Debtor only ended up paying $700, this amount is still excessive in light of the limited role of a BPP and HLS's conduct in this case, which can leniently be described as negligent. Furthermore, neither the $700 that was actually paid nor the $4500 that was contemplated to be paid was disclosed on the petition as required by § 110(h)(2).

32.  HLS made absolutely no effort to disclose its involvement in this case despite the requirements of § 110, and the record indicates that HLS's complete failure to disclose its

involvement, particularly its fees, is by design, not inattention. Had HLS provided the Debtor with the BPP Notice, the Debtor would have been given notice that she was dealing with a non-attorney, and, presumably, she would have been less likely to pay HLS an excessive fee (if anything at all). HLS falsely marking on the Debtor's petition that the she had made no pre-petition payments to non-attorneys also facilitates HLS's ability to charge excessive fees by making it more difficult for such fees to be reviewed. Similarly, HLS appears to appreciate the problems of practicing law without a license as it takes great pains to disclaim that it is providing legal advice. For example, the Consulting Agreement provides HLS's "non-legal advice" is relevant to the Debtor's matter and that its representatives cannot provide legal advice. Yet, the Consulting Agreement also provides that the work done by non-attorneys is under the direct supervision of HLS's various attorneys, that the Debtor should keep HLS apprised of any pending legal matters, and Appendix A lists numerous legal actions that HLS will prepare on the Debtor's behalf. Thomas's assertions in the Response and the Second Response confirm this posture of disclaiming an operation of providing legal advice while also describing services that are in the nature of practicing law. Notwithstanding its apprehension of the travails of practicing law without a license, HLS has elected to employ documents that

guise its operations with a cloak of legitimacy to people without legal training (like the Debtor) who are unable to distinguish between legitimate and illegitimate providers of legal services.

33. Now that its actions have been subjected to scrutiny, HLS has adopted the position that it is permissible for it to directly solicit business from a person in North Carolina, but it is somehow unfair to require HLS to appear in a court located in North Carolina. HLS is also disavowing any involvement with this bankruptcy case. However, HLS's assertion in regard to the inconvenience of having to appear before this court is unreasonable, and HLS's assertion in regard to its non-involvement with this case is untruthful. The record shows that HLS served as the Debtor's BPP, and it appears that HLS would rather deceive the court than acknowledge its wrongful conduct.

34. Pursuant to § 110(l)(1), the court fines HLS a total of $1500 for the following three instances of its providing legal advice in violation of § 110(e): advising the Debtor to file for bankruptcy, advising the Debtor that she should file under Chapter 13, and advising the Debtor that filing bankruptcy would allow her to save her home from foreclosure. HLS is also fined $500 under § 110(l)(1) due to its violating § 110(h) by charging an excessive fee and an additional $500 for failing to disclose the fee. HLS markets itself as "Haven *Legal* Services"

in contravention of § 110(f), which, in theory, subjects HLS to a $500 sanction under § 110(l)(1) every time it solicits business. However, the court will only fine HLS $500 for generally posturing itself as a provider of legal services by virtue of its name. HLS is fined a total of $1500 under § 110(l)(1) for its failure to sign and provide its name and address on the petition, Social Security Number Statement, and Creditors Matrix Verification as required by § 110(b)(1), and it is fined an additional $1500 under § 110(l)(1) for failing to list an identifying number on these documents as required by § 110(c)(1). HLS is likewise fined $500 for failing to provide the Debtor with the BPP Notice pre-petition and another $500 for failure to file the BPP Notice. In sum, HLS is subject to $7000 in fines pursuant to § 110(l)(1). As has been discussed, HLS prepared the documents that were filed in a manner that concealed its identity, and, as a result, the court is required by § 110(l)(2) to treble the $7000 fine under § 110(l)(1) to $21,000. These funds shall be payable pursuant to § 110(l)(4)(B).[3]

35.   In light of HLS's non-compliance with § 110, the court will require that the $700 paid to HLS by the Debtor be

---

[3] Section 110(l)(4)(B) provides that "[f]ines imposed under this subsection in judicial districts served by bankruptcy administrators shall be deposited as offsetting receipts to the fund established under section 1931 of title 28, and shall remain available until expended to reimburse any appropriation for the amount paid out of such appropriation for expenses of the operation and maintenance of the courts of the United States."

disgorged pursuant to § 110(h)(3)(B). Similarly, pursuant to § 110(i)(1), the court will also direct HLS to pay the Debtor $310 for the filing fee for this case, $57 for damages related to her lost salary attending the June 14, 2017 hearing, $6.50 for her parking expenses, and $2000 in light of HLS's violations of § 110. The total amount payable to the Debtor by HLS is $3073.50.

36. In addition to the monetary penalties described above, the court will also enjoin HLS pursuant to § 110(j) from any further violations of § 110. If HLS violates § 110 after the entry of this Order, fails to appear at the compliance hearing on this Order, or fails to timely pay the sanctions required by this Order, the court will enjoin HLS from acting as a BPP in any bankruptcy case in the United States. Lastly, HLS is in contempt for its failure to appear at the June 14, 2017 hearing on the Show Cause Order. HLS may purge its contempt by timely paying the applicable sanctions outlined in this Order and by appearing at the compliance hearing on this Order.

## CONCLUSION

Based on the foregoing, Haven Legal Services is **ORDERED TO PAY** the following sums in certified funds on or before the close of business on Friday, September 22, 2017:

(1) **$3073.50** payable to the Debtor, c/o Warren L. Tadlock, Chapter 13 Trustee, 5970 Fairview Road, Suite 650, Charlotte, North Carolina 28210;

(2) **$21,000.00** payable to the Clerk for the United States Bankruptcy Court, 401 West Trade Street, Charlotte, North Carolina 28202.

In addition, Haven Legal Services is **PERMANENTLY ENJOINED** from any future violations of 11 U.S.C. § 110, and Haven Legal Services is **HELD IN CONTEMPT OF COURT** due to its failure to appear at the June 14, 2017 hearing on the Show Cause Order. HLS may purge its contempt by timely paying the $3073.50 payable to the Debtor, timely paying the $21,000.00 payable to the Clerk for the United States Bankruptcy Court, and attending the compliance hearing on this Order and the Show Cause Order. The court will conduct the compliance hearing at 2:30 p.m. on September 26, 2017 at the Charles R. Jonas Federal Building, Courtroom 1-5, 401 West Trade Street, Charlotte, North Carolina 28202. Should Haven Legal Services fail to purge its contempt, the court will consider additional sanctions, including permanently barring HLS from serving as a BPP in any bankruptcy case in the United States, additional monetary sanctions, and referral to the United States District Court for civil and/or criminal contempt proceedings. Lastly, the court directs that

this  Order  be  sent  to  the  state  Bars  of  North  Carolina  and

California.

      **SO ORDERED.**

This Order has been signed                          United States Bankruptcy Court
electronically. The Judge's
signature and Court's seal
appear at the top of the Order.